Staples, J.
This is an action of trover, brought by George W. Garrett against the Eastern Lunatic Asyin the Circuit court of James City county. Upon trial at the 'April term 1874, the parties waiving a jury, judgment was rendered for the plaintiff. The defendant moved for a new trial, which was overruled. Thereupon the defendant excepted and the court certified the evidence.
This evidence, so far as it is material to the present purpose, shows that from the beginning of the year 1868 to the close of the war, the federal troops stationed at Williamsburg controlled the asylum there, the officer in command exercising chief command.
Previous to this time, a superintendent appointed by the Pierpoint government had the management fora brief period. There was no board of directors, the members having left the community, and were scattered over the country. Many of the subordinate officers, however, remained at the asylum in discharge-of their duties. During the time the military had the control, they furnished the institution with supplies, often sending parties into the country and taking provisions from the citizens. In January 1865, a party of Federal soldiers was sent out under the command of a captain, upon an expedition of the kind. They went to the residence of - the plaintiff, who was absent, and by force took all his corn and salted pork, sufficient to fill ten large four-horse wagons, one of which belonged to the asylum. The wagons were first driven to Fort Magruder, a military post near Williamsburg, and from that place, without being unloaded, were sent by the commanding officer directly to the asylum, where the provisions were left for the use of the inmates.
Upon this state of facts we are called upon to de *167 termine whether the asylum can be held liable for the value of the plaintiff’s property. No right-thinking man will question the equity of the claim The plaintiff ought to be paid, unless there is some very positive, direct, legal impediment in the way of , . his recovery.
The ground taken by tbe defendant is, that the Federal commander had by the laws of war the right to take the plaintiff’s property; and the mere fact that the property was subsequently appropriated to the use of the asylum, instead of the Federal troops, cannot impose any legal liability upon the asylum to account-for its value-. In other words, the goods became, by the capture, the property of the United States government, and the plaintiff had no longer any claim to them as against any person whatever.
In considering this argument, it is proper to enquire very briefly, what is the usage of nations engaged in war with regard to the capture of moveable property on land. The general rule, well settled by the humanity and policy of modern times, is to abstain from taking such property without making compensation, unless in special cases declared by the necessary operations of war. Tbe exceptions are, first, seizure by way of penalty for military offences; second, property taken on the field of battle, or in storming a fortress or town, which is usually termed booty; and, third, forced contributions or levies for the support of the invading army, or as an indemnity for the expense of maintaining order and affording protection to the inhabitants.
Another exception to the rule is said to be found in the peculiar nature of the property which,is the subject of capture. If the hostile power has an interest in the property which is available to him for the pur *168 poses of wav, that fact makes it prima facie liable to capture. 1 Kent Com. 112; Dana’s Wheat. 256, note 171; Halleck 457.
In the late war. between the northern and southern sections cotton was regarded as a subject of foreign and domestic commerce, and as one of the main sources of war relied upon by the Confederate authorities for the purchase of arms and the preservation and extension of the public credit. It was therefore held in the federal courts to be a lawful subject of capture. The decision of the Supreme Court of the United States in Mrs. Alexander’s cotton, 2 Wall. U. S. R. 401, was placed avowedly upon this ground and this alone. See also Coolidge v. Guthrie, decided by Mr. Justice Swayne in the United States Circuit Court for the northern district of Ohio, 8 Amer. Law Reg. N. S. page 22.
In this last case the cotton had been taken from the farm of General Pillow and sold by General Curtis of the United States army. In an action against the purchaser, the defence was placed wholly upon the ground that cotton was Jawful prize of war: It was not asserted by any one, that it was competent for a federal officer to seize and confiscate any and every species of moveable property belonging to Southern citizens, and by such seizure divest'the title of the true owner.
In 1780 an officer under the command of Lord Cornwallis, or Lord Eaudon, took from a farmer in South Carolina negroes, horses, cattle and hogs, and under military orders had them taken to the British garrison at Camden. He was sued by the owner in 1784; and he pleaded the orders of his superiors, and further, that no part of the property was appropriated to his own use: but the court held that both his supe *169 rior officers and himself were equally guilty as trespassers.
In the case of Clark v. Dick, decided in the court of the United States for the district of Missouri, reported in 9 Amer. Law Reg. N. S. 739, the defendent pleaded that at the time of the alleged trespass a state of civil war existed, and martial law duly declared; that the alleged trespasses were compulsory assessments made by order of the commanding general of the army of the department of Missouri. It was held that these facts brought the ease within the influence of the provision of the Missouri constitution exempting persons from all liability civil and criminal, for acts done during the war under the authority of the United States government and its officers. It was not pretended in that ease, that the defendant was exempt by the laws of war from all liability. The sole reliance of the defence was the constitutional provision referred to. See also Lucas v. Bruce, 4 Amer. Law Reg. N. S. 95; Cummings v. Diggs’ adm’or, 1 Heiskill N. 67.
These cases were not decided by courts of the last resort; they are, therefore not cited as controlling authority. RTor do I mean to affirm that the doctrines they announce are in entire harmony with the laws of war as laid down by learned publicists and commentators. They, however, show the general repugnance of the courts to give any extension to this doctrine of military supremacy over the lives and property of citizens even in the time of actual hostilities.
Be this as it may, the laws of nations already stated, exempt property or land from seizure and confiscation, except it be such as is available to the enemy for purposes of war, or such as may become booty in •special cases, when taken from enemies in the field or *170 in beseiged towns, or such as may be necessary to the-actual operation of the invading army, and is taken way of military contributions levied upon the in-. habitants of the hostile territory.
In the present ease, the seizure of the plaintiff’s property cannot be justified upon either of the grounds-mentioned. The only one of- these which furnishes any semblance of warrant for the act, is that the goods were taken by way of military requisition or assessment. It will be observed, however, that they were not taken for the use of the army, or for the benefit of the United States government. It-was not the intention of the officer to appropriate the property to either of these objects; nor was it taken by way of indemnity to the conqueror for expenses incurred in supporting the inhabitants. It is one thing to exercise a right of capture for the government, another, and a very different thing, to seize the property of one citizen merely for the purpose of transfer to another.
There is no doubt but that the federal commander at Williamsburg was influenced by motives of humanity, and to a great extent by actual necessity, in taking charge of the asylum, and in furnishing the inmates -with the means of subsistence. The institution was left by the calamities of war without a board of directors, without a superintendent, and without the means of subsistence. In this condition of things the strongest considerations of humanity required the federal authorities to see that the unfortunate inmates were not left to starve, nor tui’ned loose upon the country, to add to the horrors of the struggle. But whatever may have been the necessities of the asylum, the military authorities were not authorized to relieve-them by exactions and forced conti’ibutions levied, upon the plaintiff. With equal propriety it might be *171 claimed that the federal commander finding a citizen in want of a horse to cultivate his farm could seize the plaintiff’s, and appropriate it to that purpose, and thus divest the title.
In the case of Moran v. Smell, 5 West Va. R. 26, it appeared that a party of Confederate soldiers had gone into the county of Taylor and taken a number of horses belonging to citizens of that county; thereupon a federal officer commanding a military post for the department of West Virginia, ordered an equal number of horses to be taken from citizens who sympathized with the Confederate cause, and turned over to the persons whose horses had been taken by the Confederate soldiers. The plaintiff was one of those whose horse was seized by the order of the federal commander, and after the war he brought his action of trover against the party having the horse in possession under authority of the federal officer.
The Supreme court of West Virginia, a tribunal then certainly having but little sympathy with the Confederate cause, unanimously held that the act of the federal officer was illegal, and conferred no title upon the defendant. And yet it is easy to understand that the decision would probably have been very different if the officer had seized the horse for the use of the army, in the exercise of the right of capture. The plaintiff’s title being divested by the capture for lawful purposes in war, he could not have recovered against the defendant, no matter how the latter might have acquired possession.
In the present case it may be that the federal commander seized the plaintiff’s property by virtue of his authority and power as an officer; but it is perfectly clear that he was not exercising, or attempting to exercise, the right of capturing an enemy’s property for *172 purposes of war. That power he could exercise only for the benefit of his army or his government. In to seize and transfer the plaintiff’s proPer^ to the defendant, he transcended his authority and violated the laws and usages of war.
The most just and reasonable inference is, that he did not intend to determine anything affecting the right of property; that having taken the plaintiff’s goods by sheer physical power for the use of the asylum, his purpose was that the rights of the parties should be finally settled by the laws of that government to which they belonged. The fact that the provisions were taken to the asylum without unloading— if it indicates anything at all—plainly shows that the purpose was that these supplies must be understood as being designed exclusively for the asylum, and not for the benefit of the Federal government, its officers or agents.
We should hesitate long before we gave our sanction to an act which, if it was not robbery, was an arbitrary, seizure of the plaintiff’s property without the shadow of a justification, either as an act of war or of peace. We should be still more cautious how we sanction the doctrine that any officer of an invading army may, at his good will and pleasure, divest and establish the transfer of titles from one citizen to another, upon vague and general notions of belligerent rights and powers.
There is another point of view in which this question deserves some consideration. At the time of this seizure, the Federal authorities were in the undisputed occupation of the city of Williamsburg, and had been for more than two years. Their dominion was absolute and unquestioned. How in Mrs. Alexander’s cotton, 2 Wall. U. S. R. 15, it was insisted by her counsel, *173 that her cotton was not liable to capture because the territory was not enemy territory. The Supreme court of the United States did not controvert the position of law; but they said the military occupation by the Federal troops was too limited, too incomplete, too brief and too precarious, to change the enemy relation created for the country and its inhabitants by three years of continuing rebellion, interrupted at least, for a few weeks only, but immediately renewed and ever since maintained.
In the case before us, whatever may have been the effect of the long continued occupation of the region around Williamsburg by the federal forces—whether that territory did or did not cease to be enemy’s territory, according to the strict terms of war—still, the plaintiff' not being under the jurisdiction and control of the Confederate government, and the property being also at the time of seizure free from that control, and having so continued for years, was not in the predicament which made it the subject of capture. Both by its laws and proclamations the federal government had promised protection of persons and property to Southern citizens submitting to its control. If the officer had taken the plaintiff’s property assuredly for the use of his army without compensation, he would have violated his duties and no doubt his instructions. Much more did he transcend his authority in plundering the plaintiff for the benefit of the asylum, in taking a citizen’s goods to feed the state paupers. The language of the Supreme Court of the United States in Mitchell v. Harmony, 13 How. U. S. R. 115, is very applicable to such a case: And that is, that a military officer cannot impress the private property of a citizen into the public service without compensation, except under the most urgent necessity, such as will *174 admit of no delay, and where the action of the civil authorities would be too late in providing the means the occasion calls for. It is the emergency that £íves right; and the emergency must be shown to exist before the taking can be justified.
The only remaining question is whether an action of trover is the proper remedy in this ease. The asylum is a corporation and as such may sue or be sued in trespass or trover. Yarborough v. Bank of England, 16 East’s R. 5. If a corporation obtain property which does not belong to it, its duty is to restore it, or if used to render an equivalent to the owner. It was the duty of the corporate authorities to supply the inmates with the means of subsistence. If they failed or were unable to do so, and the plaintiff’s property was taken for that purpose by one assuming to act for the asylum, and as its agent, and the goods have been actually used by the asylum, it íb responsible for the value; and is estopped to deny the authority of the agent in the act of conversion. In all cases a destruction of the chattel is an act of conversion, for its effect is to deprive the owner entirely of his property.
It has been held in many cases, that where the law imposes an obligation on a corporation which it refuses or fails to discharge, it may be held liable civilly at the suit of a party who sustains damages in consequence of its refusal. And where the law makes paupers or lunatics a charge upon a corporation, it is bound to provide them a comfortable support. And it has been held in a number of cases that if the corporation will not discharge this duty, individuals may furnish the necessaries and look to the corporation for remuneration. Trustees of Cincinnati township &c. v. Ogden, 5 Ham. R. 28; Shreve v. Budd, 2 Halst. R. 431; *175 Seagraves v. City of Alton, 13 Illi. R. 366; Tomlinson v. Bentall, 5 Barn. and Cress, 738. See also Argenti v. City of San Francisco, 16 Cal. R. 255, 282. And case in 2 Rob. Prac. (New E.) 443-’4. Here the case is much stronger. If the asylum did not intend to 0 ° * adopt the act of the officer acting as superintendent and agent it ought to have restored the goods, or if that was impossible it was bound to render an equivalent in value.
Christian, J.
I cannot give my assent to the judgment of the court in this case.
In my opinion, upon plain principles of law, no legal liabiliiy can be fixed upon the corporation known as the “Eastern Lunatic Asylum,” for the value of the provisions taken by the military commander, and appropriated by him to the use of the lunatics in that asylum.
The action brought by the appellee (Garrett) is an action of trover and conversion '. To maintain such an action two things are essential: First, The title to the property must be in the plaintiff; Second, The conversion by the defendant must be wrongful, or at least voluntary. In this case both of these essential elements are wanting.
Eirst: As to the title. Garrett was divested of his title, by the regular impressment made by the order of the military officer in command at Williamsburg.
The record shows that when the Confederate army retired from the Peninsula, the city of Williamsburg was occupied by the Eederal army, and the Eastern Lunatic Asylum, located in that city, was from that time under the exclusive control and protection of the Eederal commander assigned to that military post by the Eederal government. Both the superintendent *176 and directors of that institution had fled with the-Confederate army. -Indeed, all the officers of the in-except perhaps the nurses and other subordina*e empl°yees of the asylum, left upon the evacuation of the city of Williamsburg by the Confederate forces. It became a matter of stern necessity, as well as the highest duty of humanity, that the military commander should take possession of that institution and provide for its unhappy and defenceless-inmates, who could make no provision for themselves.
That this military commander had the right, under the laws of war, to make impressments, and compel forced contributions from the people residing within the military district of which he had command, for-the support of the unfortunate lunatics whom the fortunes of war had placed under his protection, seems to me too plain a proposition for serious debate or question.
Upon the evacuation of the city of Williamsburg, and its occupation by the Federal army, Colonel West, the officer in command, found this asylum, with its. hundreds of unhappy and dependent inmates, deserted by its officers, without provisions, and helpless to provide them.’ Must they be turned loose? Must they be left within the walls of the asylum as prisoners to starve? What did the enlightened public law and the laws of civilized .warfare demand at his hands? Plainly to protect them and provide them with food. Must this food be furnished out of his own commisariat? Had he not the right to make forced contributions upon the people for that purpose? Must these poor unfortunates starve because he could not furnish them out of his own commissary stores, and because he had no authority to impress provisions for that purpose? If these provisions (the corn and pork of Garrett) had *177 been taken by impressment, by order of Colonel West for the support of his own army', the title (it is eon-ceded) would have passed out of Garrett at the ment of the impressment. Did not the title also pass x to the federal commander, and out of Garrett, the moment they were impressed for the legitimate and more humane use of these poor starving lunatics?
It must be borne in mind that these provisions (corn ■ and pork) taken from the defendant in error (Garrett) were not seized by a. band of maraudei’s and robbers without authority, but by a military officer acting under authority of Colonel West, an officer in command of the military district, and in command of the army of occupation.
That such property as that taken from the plaintiff was a proper subject of capture under the laws of war cannot be denied.
The principles of public law, recognized by all civilized nations, and asserted by all enlightened publicists, declare the right of capture of such property by the army of occupation; and when taken, not by marauders, but by regular impressment, authorized by the officer in command', is lawful. Halleck’s In. Hat. Law 458, § 15, and cases there cited.
The title to property thus taken in war must, upon general principles, be considered as immediately divested from the original owner, and transferred to the captor. As to personal property or moveables, the title is in general lost to the former propi’ietors, as soon as the enemy has acquired a firm possession. The property becomes absolutely the property of the captor, and the original owner is absolutely divested of his title thereto. Wheaton on International Law, § 359; 1 Kent’s Com. 110 (marg.); also see Secretary Marcy’s' *178 Instructions to General Taylor in note to 1st Kent 92 , , (marg). .
ÍTow it is conceded in the opinion of the court, that jf Garrett’s corn and pork had been taken for the support of the army of occupation, the capture would been lawful, and the original owner divested of his title. But it is said that as they were not taken for that purpose, but for the use of the lunatics, the title of the owner was not divested, and that he may recover their value from the Eastern Lunatic Asylum. I cannot see the force of this view. If the property taken was subject to capture under the laws of war; if it was made by regular impressment by an officer having authority to make it, the title loas at once transferred to the captors, and was no longer in the original owner. It matters not (the property itself being under the laws of war a proper subject of capture), what disposition the captor made of it, whether he fed it away to his own soldiers, or distributed it among the poor, or gave it away to prisoners he had captured, pr fed it away to starving and helpless lunatics, whom .the fortunes of war had placed under his protection and control, the question of title cannot be affected by the use he made of the provisions. They were a proper subject of capture to an army of occupation in the enemy’s country, and when captured by regular impressment the title passed to the captor, and cannot be affected by the use the captor made of them, whether used to feed the army of occupation, or as a benefaction to the helpless inmates of a lunatic asylum.
I deny that the military commander had the right to make capture of provisions only for the support and maintenance of his army. I insist that upon principle and express authority of the most learned writers on international law, he had the same right to make *179 forced contributions from the people within his military lines, for the support of these unhappy lunatics whom the fortunes of war had temporarily under his protection, as, it is conceded, he had to make forced contributions for the support of his own soldiers. He could do this with or without compensation if the necessity arose; and of that necessity he was the sole judge.
Mr. Halleck, in his admirable work on the Laws of War, p. 457, says: “The modern usage is not to take private property on land without making compensation, except in certain specified cases. These exceptions may be stated under three general heads: 1st, Confiscation or seizure by way of penalty for military offences. 2nd, Forced contributions for the support of invading armies, or as an indemnity for the expenses of maintaining order and affording protection to the conquered inhabitants. And, 3d, Property taken on the field of battle or in storming a fortress or town. All enlightened publicists and writers on international law, Kent, Vattel, Grotius Poison, Martens and Hefflite, lay down the same doctrine. One of the exceptions to the general rule (that private property on land ought not to be taken without compensation) is that it may be there “/or the purpose of affording protection to the conquered inhabitantsand these writers all agree that when so taken the title of the original owner is divested.
If private property may be taken for the purpose of affording protection to the conquered inhabitants, surely a multi fortiori it may be done also for the protection and maintenance of that part of the conquered inhabitants who are helpless and hopeless lunatics. It is clear, therefore, that the corn and pork taken from Garrett being property which under the laws of war *180 was subject to capture, and being taken by regular impressment by the commanding officer of tbe army of occupation, the legal title of Garrett in this property was divested from him and vested in the captor. It follows, therefore, that Garrett having no title, cannot maintain the action of trover.
So much for the plaintiff. How is it with the defendant? Hid the defendant make a conversion of this property? Who is the defendant? The Eastern Lunatic Asylum, a corporation created by statute, and composed of the president and board of directors. How did this corporation make the conversion complained of by the plaintiff? At the time of the transaction, out of which this suit grew, the board of direcrectors was scattered, the superintendent was gone. There was no corporate body at Williamsburg. The building was there, and the unhappy inmates were there; but the board of directors, and every officer except certain subordinates, such as nurses, &c., were all gone. The corporation was not thei'e. It could make no contract—it could commit no trespass—it could make no conversion.
Here then we have a ease in which, in an action of trover, a plaintiff who has no title, recovers against a defendant, who not only did not, but could not, make a conversion.
But it is said that the inmates of the Eastern Lunatic Asylum got the benefit of, had the use of Garrett’s corn and pork, and therefore the corporation ought to pay for them. Is this a sound view? How waiving the insuperable objections as to the form of the action, is this true? Let us see if, upon the most equitable and liberal principles, treating the action of trover as an equitable action, this is true?
Suppose that Colonel West (as he did do in fact) had arrested as prisoners a number of citizens of Wil *181 liamsburg, and had fed them during their imprisonment with the provisions taken from Garrett: is it possible that after the close of the war those could have been sued by Garrett, and a recovery had upon the ground that they had the use of the provisions thus taken, and that too in an action of trover and conversion? Or suppose (as he did do) Colonel "West had distributed to the poor of ’ Williamsburg certain provisions, and these were such as he had captured from Mr. Garrett: is it possible that after the war Garrett could have recovered of the returned Confederate soldier the valué of these provisions, consumed by his family, given to them by the Federal commander, upon the ground that those families used them, and that too in an action of trover. The negative to these questions is no stronger than the negative to the proposition which this court asserts against the Eastern Lunatic Asylum. To maintain such an action is to reverse all the rules of law, and to declare that in an action of trover a plaintiff without title can recover against a defendant who did not and could not make a conversion.
If the appellee has any claim it is one that ought' to be addressed to the generosity and sense of justice of the legislature, but cannot be maintained in a court of law. I am for reversing the judgment of the Circuit court, and remitting the appellee for redress to the legislature.
Moncure, P., and Anderson, J., concurred in the •opinion of Staples, J.
Judgment arrirmed.